431 A.2d 243

**PORT AUTHORITY OF ALLEGHENY COUNTY, Appellant (Appellant in the Commonwealth Court)**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellee (Appellee in the Commonwealth Court)**

**Colonial Taxi Company, Inc., et al., Intervenors.**

Supreme Court of Pennsylvania.

Argued Sept. 29, 1980.

Decided July 2, 1981.

Robert M. Brown, Dennis L. Veraldi, James H. Norris, Ruffin, Hazlett, Snyder, Brown & Jack, Pittsburgh, for appellant.

George M. Kaski, Chief Counsel, Joseph J. Malatesta, Jr., Deputy Chief Counsel, Daniel P. Delaney, Asst. Counsel, Harrisburg, for appellee.

Richard S. Dorfzaun, Dickie, McCamey & Chilcote, Pittsburgh, for Yellow Cab Co. of Pittsburgh.

William A. Gray, Wick, Vuono & Lavelle, Pittsburgh, for Open Doors etc.

Arthur J. Diskin, Pittsburgh, for North Hills Green Cab, et al. and Colonial Taxi Company, Inc., et al.

Jerome Solomon, Brandt, Milnes, Rea & Malone, John A. Pillar, Pittsburgh, for Tube City Taxicab Co., Inc., et al.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

KAUFFMAN, Justice.

This is an appeal from an order of the Commonwealth Court affirming the orders of the Pennsylvania Public Utility Commission ("PUC") granting to intervenors, five companies in Allegheny County, the right to provide paratransit service.[1] At issue is whether the PUC has been divested of jurisdiction over paratransit within Allegheny County by the Second Class County Port Authority Act ("Port Authority Act"), Act of April 6, 1956, P.L. 1414, *as amended*, 55 P.S. §§ 551–563.5, which grants to appellant, the Port Authority of Allegheny County ("Port Authority"), exclusive jurisdiction over the transportation system within Allegheny County.[2]

Paratransit consists largely of rider-sharing service performed under contracts with organizations aiding the elderly or handicapped. Transportation is reserved in advance, and the individuals are picked up at their homes and driven to their destinations in vehicles not reserved for individual use having a seating capacity of not less than seven nor more than fifteen passengers including the driver. When ready to return, they call the paratransit operator and a van is dispatched. In addition, members of the public, whether handicapped or able-bodied, may reserve a van for transportation to and from their homes and various destinations, not including the Greater Pittsburgh Airport. Neither the routes nor the schedules are fixed, and unlike group and party service which entails picking up a group of people already assembled at one point and transporting them to a central location, paratransit passengers are received and discharged at different points. The individual passengers, as well as the social service organizations, pay a rate determined on an hourly or mileage basis.

1. The five intervenor companies are: Colonial Taxi Co., Inc.; Tube City Taxicab Company; The North Hills Green Cab Company; Open Doors for the Handicapped, t/d/b/a Magic Carpet Transportation for the Handicapped; and the Yellow Cab Company of Pittsburgh.

2. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, 42 Pa.C.S.A. § 724(a).

The issue presented here arose when the intervenors, in response to the following Statement of Policy issued by the PUC on January 31, 1976, filed applications with the PUC for approval to render a type of transportation service not authorized by the call or demand certificates four of them already possessed:

The Public Utility Commission has become increasingly aware of publicly funded transportation programs sponsored by county and state agencies to provide rider-sharing service. These transportation programs typically feature the use of a shared vehicle upon request of a number of individual passengers who may have different origins and destinations.

Some certified taxicab operators authorized by the Commission to provide common carrier transportation of passengers upon call or demand, who have received requests to provide such services, *desire to use van-type vehicles under their existing certificates.* The Commission is also aware of several different types of service being proposed under the aforementioned programs, and *has observed potential conflicts with its present regulations.* With a view of obviating such conflicts, the Commission deems it to be in the public interest to *entertain Applications by those desiring to provide the foregoing transportation services.*

Such Applications shall be in sufficient detail so as to indicate the area to be served, the type of vehicle and service to be performed, the seating capacity of the vehicle necessary to meet the aims of the programs and the proposed fare structure directly or indirectly to be applied to the service.

In situations in which an immediate need for the transportation service is indicated, the Commission will, with the filing of the Application, entertain requests for *temporary authority to perform the proposed service* pending the disposition of the Application. A grant of temporary authority will not be considered as creating a presumption that corresponding permanent authority will be granted thereafter.

This Policy Statement shall not be construed as limiting the performance of ride-sharing service to existing certificated carriers or to the use of van-type vehicles or to programs sponsored by federal, state, county or local agencies.

The Commission is aware that *para-transit developments are changing rapidly* and *may require an entire new category of new carrier to perform the service properly.*

In acknowledging the existence of circumstances which resulted in entering the foregoing statement of policy, the Commission is not restricting itself against further changes as conditions may necessitate. (Emphasis supplied).[3]

The Port Authority filed Motions to Dismiss each of the applications on the ground that the Port Authority Act had divested the PUC of jurisdiction to grant the rights requested. The administrative law judge denied each of these motions, and hearings were then held. The PUC affirmed the administrative law judge's proposed decisions and awarded the requested authority in each case. The Commonwealth Court consolidated the Port Authority's Petitions for Review and affirmed the PUC's orders.[4] We granted allocatur and now reverse. 44 Pa.Cmwlth. 371, 405 A.2d 552.

Both the PUC and the Port Authority are creatures of the Legislature and have only those powers conferred upon them by statute. *Western Pennsylvania Water Company v. Pennsylvania Public Utility Commission*, 471 Pa. 347, 370 A.2d 337 (1977). To provide Allegheny County with a unified transportation system, the Legislature created the Port Authority and defined its rights, powers and purposes in Section 3 of the Port Authority Act:

**3.** This Statement of Policy was made of record by counsel for the PUC at the first of the hearings on intervenors' applications. (R. 560a–561a)

**4.** *Port Authority of Allegheny County v. Pennsylvania Public Utility Commission*, 44 Pa.Cmwlth. 371, 405 A.2d 552 (1979).

Each authority shall be for the purpose of planning, acquiring, holding, constructing, improving, maintaining and operating, owning, leasing, either as lessor or lessee, port facilities within the port district, and a *transportation system* in the county by which it is incorporated and outside of the county to the extent necessary for (i) the establishment of an *integrated system*; . . . .

55 P.S. § 553(a) (emphasis supplied). Section 3 further provides that "[t]he authority shall determine *by itself exclusively*, the facilities to be operated by it and the services to be available to the public." 55 P.S. § 553(b)(9) (emphasis supplied).

In vesting the Port Authority with exclusive jurisdiction over the transportation system within Allegheny County, the Legislature explicitly divested the PUC of jurisdiction over that transportation system:

Upon the recording of the plan of integrated operation, any law to the contrary notwithstanding, *the authority shall have exclusive jurisdiction with respect to all matters regarding (a) its transportation system within the service area* as set forth in the plan of operation or as from time to time changed as in this section provided. *The Public Utility Commission shall have no authority to grant certificates of public convenience for a transportation system within the service area of the authority* or for the establishment of group and party rights to operate wholly within such service area. The Public Utility Commission shall continue to have jurisdiction, except as otherwise provided in this section, with respect to all matters regarding those transportation systems and group and party rights to operate into or out of said service area.

55 P.S. § 563.1 (emphasis supplied).

The critical terms "transportation system" and "service area" were expressly defined by the Legislature:

(13) The term *"transportation system"* shall mean all property, real and personal, useful for the transportation of passengers for hire, *including but not limited to* power plants, substations, terminals, garages, bridges, tunnels,

subways, monorail, railroad motive power, trains, railroad passenger cars, and equipment, belt conveyors, inclines, car barns, street cars, buses, rails, lines, poles, wires, off-street parking facilities, as well as the franchises, rights and licenses therefor, including rights to provide group and party services: *Provided, that such term shall not include taxicabs or bus companies, the main purpose of which is the transportation of children to and from school.*

\*     \*     \*     \*     \*     \*

(17) The term "service area" shall mean the entire county incorporating the authority. . . .

55 P.S. § 552 (emphasis supplied). It is manifest from this plain and unambiguous statutory language that PUC jurisdiction over transportation of passengers for hire within Allegheny County has been legislatively restricted to taxicabs and school buses. Since paratransit service obviously does not include school buses, the sole issue before the Commonwealth Court was whether paratransit service was within the taxicab exclusion to the exclusive jurisdiction of the Port Authority within Allegheny County.

Nevertheless, the Commonwealth Court concluded, and the PUC here argues, that the jurisdiction of the Port Authority is limited to the transportation of persons on schedule over fixed routes, and that except for group and party service, all other forms of public transportation remain within the PUC's jurisdiction.[5] We reject this restrict-

5. In reaching this result, the Commonwealth Court disregarded the specific definition of "transportation system" included in the Port Authority Act and relied instead on the definition of an "urban mass transportation system" found in the Vehicle Code, Act of June 17, 1976, P.L. 162, 75 Pa.C.S.A. § 102:

A person holding a certificate of the Public Utility Commission or a municipality authority, port authority or transportation authority established under the laws of this Commonwealth that transports persons on schedule over fixed routes and derives over 80% of their intrastate scheduled revenue from scheduled operations within the county. . . .

The Commonwealth Court then reasoned that since paratransit did not operate on schedule over fixed routes, it was not included within the broad legislative grant of jurisdiction to the Port Authority. In view of the fact that the Port Authority Act clearly defines the

ed view of the Port Authority's jurisdiction because it is contrary to the clear and express language of the Port Authority Act, and it is elementary that the plain words of a statute may not be disregarded where the language is clear and free from all ambiguity. 1 Pa.C.S.A. § 1921(b); *Erie-Western Pennsylvania Port Authority v. Rugare*, 29 Pa. Cmwlth. 83, 370 A.2d 768 (1977). Moreover, if the Port Authority Act's broad definition of "transportation system" in Section 2(13) were intended to mean only scheduled, fixed route service, the specific exclusion for taxicabs would be nothing but surplusage, since taxicab service is neither scheduled nor performed over fixed routes.[6] And the Legislature is presumed not to have intended its laws to contain surplusage. *Lynch v. O. J. Roberts School District*, 430 Pa. 461, 469, 244 A.2d 1, 5 (1968).

In its January 31, 1976 Statement of Policy, the PUC expressly declared that its then current classification of common carriers did not cover the new types of services or new types of vehicles contemplated by the Statement and that authority to provide call or demand taxicab service did not include authority to provide paratransit service. Thus, the PUC itself did not equate taxicabs and paratransit service. This position was further confirmed by counsel for the PUC at the first of the hearings involved herein:

This proceeding is concerned with an application filed by *The Yellow Cab Company* of Pittsburgh, *a certificated*

"transportation system" over which the Port Authority has been vested with exclusive jurisdiction, reliance upon a definition in a totally separate and distinct statute was inappropriate.

**6.** PUC regulations classify common carriers into three groups:
1. Scheduled route service between fixed termini or over designated routes.
2. Call or demand service.
3. Group or party service, including special excursions and sightseeing tours.

52 Pa.Code § 29.13. 52 Pa.Code § 29.16(4) uses the terms "call or demand" and "taxi service" synonymously. Thus, taxicab service is by definition clearly distinct from scheduled, fixed route transportation service.

*taxicab operator,* authorized by the Commission to provide transportation, as a common carrier, of passengers upon call or demand in the Greater Pittsburgh area. As I understand the general background of this application, Yellow Cab has for some period of time or may have been for some period of time utilizing *both passenger vans* and *taxis* in providing *a share-riding type of service which is neither entirely call or demand, or scheduled route and group and party service, but is a hybrid or paratransit service with some elements of both.*

The Commission, being aware of this growing form of *ride-sharing service* as distinguished from a purely scheduled route or group and party service, and noting that much of this form of service is publicly funded, at least in part, did on January 31, 1976 publish a statement of policy in which it held that *it was in the public interest to entertain applications from those desiring to provide such services.* Accordingly, this is the posture of the present application proceeding, the principal purpose of which is to develop a record that will detail the circumstances under which the applied for services are being provided.

(R. 559a–560a) (emphasis supplied).

That the applications filed in compliance with the Statement of Policy are not for permission to provide call or demand taxicab service is conclusively demonstrated from the fact that four of the applicants already hold call or demand certificates for the territory for which they seek the *additional* authority.[7] In each of its adjudications, the PUC

---

7. See, for example, the testimony of Albert J. Hayes, Yellow Cab's representative:

Q: The application for the rights which you are seeking is that application co-extensive as far as territory is concerned with the certificates that you now hold for call and demand service?
A: It's not as large.
Q: Let me state the question another way so I'm sure I understand what you're saying.
*All of the territory that you're asking for in this application is already covered by call and demand certificate?*
A: Yes.
(R. 586a) (emphasis supplied).

refers to the application as one for an *additional right* to transport, as a common carrier, by motor vehicle, persons in para-transit special operations." (R. 120a, 224a, 368a) (emphasis supplied). Clearly, if the PUC considered paratransit service to be the same as taxicab service, it would have been redundant to require intervenors to file new applications for authority they already possessed.

In each case, the intervenors sought, and the PUC granted, the right to use vans carrying not less than seven nor more than fifteen passengers. In contrast, the PUC's supplemental taxicab regulations, 52 Pa.Code §§ 29.121–29.136, clearly limit the type of motor vehicle to be used in taxicab service to "a four-door passenger automobile, with immoveable hardtop, having a closed body with a single compartment for passengers and the operator." 52 Pa.Code § 29.123.

Similarly, although 52 Pa. Code 29.130 requires that all taxicabs have taximeters, the record reflects that the vans used in paratransit typically do not have taximeters and a flat rate is charged for their use. Furthermore, the PUC carefully regulates group riding in taxicabs, 52 Pa. Code §§ 29.125 and 29.131, and limits it to periods of abnormal demand and only with the consent of the first party to engage the taxicab. Paratransit, however, is characterized by group and shared riding, and the PUC's orders now before us specifically limit paratransit service to vehicles "not reserved for individual use."

The record leads inescapably to the conclusion that paratransit service is not the equivalent of taxicab service and thus has not been excluded from the broad statutory grant of jurisdiction to the Port Authority. Accordingly, we conclude that the Port Authority has been vested with exclusive jurisdiction within Allegheny County over the type of service in controversy and that the PUC was without authority to grant the applications of the five intervenors.

The Order of the Commonwealth Court is reversed.